UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YVONNE A'RAE LAISURE-RADKE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PAR PHARMACEUTICAL, INC., *et al.*, <br><br> Defendants. | CASE NO. C03-3654RSM <br><br> ORDER DENYING MOTION FOR SUMMARY JUDGMENT BASED ON THE PREEMPTION DOCTRINE |

## I. INTRODUCTION

This matter comes before the Court on defendants' Motion for Summary Judgment based on the Preemption Doctrine. (Dkt. #113). Defendants argue that plaintiff's failure to warn claims are preempted by the Federal Food, Drug and Cosmetic Act ("FDCA") and the regulation promulgated by the Food and Drug Administration ("FDA") thereafter. Specifically, defendants assert that under federal regulations, a generic pharmaceutical manufacturer has no ability to alter the labeling of its drug product and is prohibited from providing warnings different from or in addition to those contained on the label of the reference listed drug. Therefore, plaintiff's state product liability claims, which are predicated on the theory that Washington State requires a duty on manufacturers to provide adequate warnings and assurances that defendants failed to provide, are in direct conflict with federal

ORDER
PAGE - 1

1  law.

2      Plaintiff opposes the motion, asserting that the preemption doctrine is not implicated in this
3  case because FDA regulations actually give drug manufacturers the ability to add or strengthen a
4  contraindication, warning or precaution about their product without FDA approval.  (Dkt. #128).

5      For the reasons set forth below, the Court agrees with plaintiff and DENIES defendants'
6  motion for summary judgment.

## II. DISCUSSION

### A. Background

    Plaintiff, Yvonne A'Rae Laisure-Radke, brings this lawsuit on behalf of herself and as individual representative of her late husband's estate.  She alleges that her husband, Douglas Radke, committed suicide while under the influence of the antidepressant drug fluoxetine, which is the generic version of Eli Lilly's Prozac.  Defendants manufacture, distribute and market the generic drug. Plaintiff essentially asserts that defendants were aware of an increased risk of suicidality in users of the class of antidepressant drugs within which Fluoxetine lies, known as selective serotonin reuptake inhibitors ("SSRIs"), well before the death of Ms. Laisure-Radke's husband, but did not adequately warn of that risk.

    In her Complaint, plaintiff makes three claims for relief, all based on Washington State products liability laws, including:

> FIRST: All defendants are jointly and severally liable for marketing a defective product with inadequate and/or legally defective labeling and for marketing with misrepresentations . . . .
>
> SECOND: Defendants' conduct is unreasonable, or negligent, and was a proximate cause of Plaintiff's decedent's injuries and death.  The manufacturers were all negligent for failing to warn, failing to test or otherwise to investigate the association between FLUOXETINE, akathisia, psychosis, and suicide, and for misrepresenting and over-promoting "FLUOXETINE."
>
> THIRD: Defendants' [sic] are liable because "FLUOXETINE" was defective and potentially harmful to its consumers/users, including Plaintiff [sic] decedent, and

because adequate warnings were not provided with the product or after manufacture, and as such was unsafe to an extent beyond that contemplated by an ordinary user and consumer set forth in RCW 7.72.030.

(Dkt. #39 at 11).

### B. Plaintiff's Sur-Reply

As a threshold matter, the Court addresses plaintiff's sur-reply. On February 20, 2006, plaintiff filed a sur-reply in response to defendants' reply. (Dkt. #150). However, that sur-reply does not comply with the Court's Local Rules or this Court's previous Order addressing such potential sur-reply, and therefore, will not be considered on this motion for summary judgment.

In this Court's previous Order allowing defendants to file an overlength Reply brief, the Court informed plaintiff that before she could file a sur-reply, she was required to notify defendants and this Court of her intent to so file, and the Court would direct a page limit at that time. (Dkt. #142). There is no indication in the record that the Court ever received such a request, or that it has allowed plaintiff to file a nine-page sur-reply. Moreover, this Court explicitly stated that, if allowed, plaintiff would address only the new FDA position statement in her sur-reply. However, the sur-reply plaintiff filed addresses that statement, and then reiterates several arguments presented in her earlier briefs. Accordingly, the Court STRIKES plaintiff's sur-reply from the record as improper.

### C. Preemption Doctrine

The Supreme Court has explained that there are three ways in which federal law will preempt a state law:

> First, Congress can define explicitly the extent to which its enactments pre-empt state law. Pre-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.
>
> Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a 'scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touches a field

ORDER
PAGE - 3

> in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: 'Where ... the field which Congress is said to have pre-empted' includes areas that have 'been traditionally occupied by the States,' congressional intent to supersede state laws must be 'clear and manifest.'
>
> Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'

*English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990) (citations omitted); *Motus v. Pfizer Inc.*, 127 F. Supp. 2d 1085, 1091-1092 (D. Cal. 2000). The court explained that these categories are not always distinct from one another. In particular, the court noted that "conflict" and "field" preemption often overlap. *Id.* at 79 n. 5. Furthermore, this Court notes that the party asserting that a claim is preempted bears the burden of establishing preemption. *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514, 1526 n. 6 (9th Cir. 1995).

In the instant case, defendants recognize that the FDCA does not contain an express preemption provision. Thus, defendants present this Court with a "conflict" argument, asserting that the Washington State law upon which plaintiff relies in support of her claims, directly conflicts with federal law, and therefore, allowing plaintiff's claims to move forward would create an "obstacle" to the objectives of Congress, as highlighted by *English*, *supra*. Defendants also note that since they filed the instant motion, the FDA has issued a Final Rule regarding preemption and labeling, which states that "under existing preemption principles, FDA approval of labeling under the act, whether it be in the old or new format, preempts conflicting or contrary State Law." (Dkt. #127, Ex. F at 38). Accordingly, the Court turns to the question of whether there is a conflict between Washington State law and federal laws concerning drug labeling. For the reasons set forth below, the Court finds that there is not.

ORDER
PAGE - 4

Case 2:03-cv-03654-RSM    Document 165    Filed 03/29/06    Page 5 of 11

*1. Impossibility with Compliance*

Since 1962, the FDA, through the FDCA, has required all drug manufacturers to submit a new drug application ("NDA") before they are allowed to market a new drug product. That application must include sufficient safety information demonstrating the drug's effectiveness for its intended use. Application Regulations, 57 Fed. Reg. 17950 (1992) (*codified* at 21 C.F.R. Part 314). Typically, drug manufacturers spend a great deal of time and money conducting studies of a drug's safety and effectiveness.

As a result of the Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, the FDA subsequently implemented an abbreviated new drug application ("ANDA") procedure for manufacturers of duplicate, or generic, drug products. Under that procedure, the FDA required all manufacturers who wished to market a generic version of a drug already approved for market, and who did not already have an approved NDA, to submit an ANDA. The ANDA procedure is available only for those drug products that: (1) are "the same as" a drug product listed in the approved drug product list published by the FDA with respect to active ingredients, route of administration, dosage form, strength and conditions of use recommended in the labeling; or (2) include changes from a listed drug if the FDA has approved a petition from a prospective applicant permitting the submission of an ANDA for the changed drug product. *See* 21 U.S.C. § 255(j). In lieu of the extensive studies usually required for an initial NDA, an applicant need only provide information that the generic drug is the same as the previously approved drug.

Relying on 21 U.S.C. § 355(j)(2)(A)(v) and 21 C.F.R. § 314.94(a)(8), defendants argue that a "generic manufacturer simply cannot deviate its labeling from that of a reference listed drug." (Dkt. #113 at 23). Defendants correctly note that as part of its ANDA, a generic manufacturer must submit information that its proposed label is identical to that of the reference listed drug. Indeed, the FDA routinely rejects proposed labels that attempt to make any changes in information not provided for

ORDER
PAGE - 5

1   under 21 U.S.C. § 355(j)(2)(A)(v), such as different dosing not approved by prior petition. *See, e.g.*,

2   *ICN Pharms., Inc. v. Geneva Pharms. Tech. Corp.*, 272 F. Supp.2d 1028, 1047 n. 18 (C.D. Cal.

3   2003) (noting that the FDA had rejected an ANDA application when the proposed labeling would be

4   different from the labeling for the reference listed drug because it contained information about a

5   different dosage level). Even the initial, proposed labeling for fluoxetine was required to undergo

6   many revisions because it failed, *inter alia*, to include information about treatment of obsessive-

7   compulsive disorder, there were words italicized on the reference listed drug label that had not been

8   italicized on the proposed fluoxetine label, there were extra hyphens in a sentence that were not on the

9   reference listed label, and later, because there had been extensive changes to the reference listed drug

10  label and the label for fluoxetine was required to match those changes. Defendants focus on this

11  regulation for the proposition that a generic manufacturer may never alter its label from the reference

12  listed drug label. However, as plaintiff points out, the flaw with defendants' argument is that <u>once the

13  ANDA is approved</u>, generic manufacturers have the same power and duty to add or strengthen their

14  warnings, as do the manufacturers of pioneer drugs, and therefore, the same liability.

15  In *Foster v. American Home Products Corp.*, 29 F.3d 165 (4th Cir. 1994), the Fourth Circuit

16  Court of Appeals examined this issue while considering whether the district court correctly held that a

17  manufacturer of a brand name prescription drug may be held liable on a negligent misrepresentation

18  theory for a death caused by another company's generically equivalent drug. Relying on 21 C.F.R.

19  §§ 314.70 and 314.97, the court found that manufacturers of generic drugs approved pursuant to an

20  ANDA may alter a drug's labeling to add or strengthen a contraindication, warning, precaution or

21  adverse reaction. *Foster*, 29 F.3d at 169. While this Court recognizes that the Fourth Circuit was not

22  specifically addressing the requirements for generic drug labeling in the *Foster* case, it finds the

23  reasoning persuasive, and the conclusion correct.

24  The regulations cited in *Foster*, and in the instant case by plaintiff, make clear that generic drug

25  ORDER
26  PAGE - 6

manufacturers, after having received an approved ANDA, have the ability to add or strengthen warnings without prior FDA approval, as long as certain conditions are met. First, this Court notes that 21 C.F.R. § 314.97 clearly states:

> Supplements and other changes to an *approved* abbreviated application.
>
> The applicant shall comply with the requirements of § § 314.70 and 314.71 regarding the submission of supplemental applications and other changes to an *approved* abbreviated application.

21 C.F.R. § 314.97 (emphasis added).

Turning to the regulations cited in 21 C.F.R. § 314.97, the Court next notes that 21 C.F.R. § § 314.70 and 314.71, which set forth the process and procedure for requesting supplemental changes to approved applications, make no distinction between an approved NDA or an approved ANDA. Indeed, 21 C.F.R. § 314.70 is simply entitled "Supplements and other changes to an approved application," while 21 C.F.R. 314.71 is entitled "Procedures for submission of a supplement to an approved application."[1] Significantly, § 314.70, provides manufacturers with a list of "major changes," which require the submission of a supplement and approval by the FDA prior to distribution of the product. 21 C.F.R. § 314.70(b)(1)-(2). Those changes include "any change in the drug substance, drug product, production process, quality controls, equipment, or facilities that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product." 21 C.F.R. § 314.70(b)(1). The statute also provides manufacturers with a list of "moderate changes," which require the submission of a supplement at least 30 days prior to distribution of the drug product made using the change. 21 C.F.R. § 314.70(c). These changes include labeling differences such as:

---

[1] The Court notes that this section was amended on January 24, 2006, with the amendments becoming effective June 30, 2006. Because the unamended version remains effective at this time, and was effective during the time period alleged in the Complaint, the Court quotes only the current regulation, not the amended version.

ORDER
PAGE - 7

     (A) To add or strengthen a contraindication, warning, precaution, or adverse reaction;

     (B) To add or strengthen a statement about drug abuse, dependence, psychological effect, or overdosage;

     (C) To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;

     (D) To delete false, misleading, or unsupported indications for use or claims for effectiveness; or

     (E) Any labeling change normally requiring a supplement submission and approval prior to distribution of the drug product that FDA specifically requests be submitted under this provision.

21 C.F.R. § 314.70(c)(6)(iii)(A)-(E). The manufacturer may distribute a drug product with one of these labeling changes upon receipt of the supplement for such change by the FDA. 21 C.F.R. § 314.70(c)(6). Accordingly, the Court agrees with plaintiff that once a generic drug manufacturer holds an approved ANDA for a particular product, it can add or strengthen a contraindication, warning, precaution or adverse reaction at any time without prior FDA approval.

     This conclusion is supported by a brief examination of the companion regulations contained in Part 314. For example, 21 C.F.R. § 314.60, entitled "Amendments to an unapproved application," also makes no distinction between and NDA or an ANDA.[2] However, the first paragraph makes clear that the regulation applies to both types of applications. It states, that "[e]xcept as provided in paragraph (b) of this section, the applicant may submit an amendment to an application that is filed under § 314.100, but not yet approved." 21 C.F.R. § 314.60(a). Section 314.100 is entitled "Time frames for reviewing applications and abbreviated applications." Thus, it is evident that in referring to the category of "approved applications" or "unapproved applications," in the titles and content of regulations 314.60 through 314.71, as highlighted above, that language was intended to cover both

---

[2] Nor does 21 C.F.R. § 314.65, entitled "Withdrawal by the applicant of an unapproved application," make any such distinction.

ORDER
PAGE - 8

NDAs and ANDAs, not just NDAs as defendants appear to contend.

While defendants are certainly correct that a generic drug manufacturer submitting an ANDA must propose and utilize the same label as the reference listed drug, that requirement does not mandate that the manufacturer cannot change its label once the ANDA has been approved. Furthermore, it is obvious from the materials cited by defendants that any state law requiring something different for generic drug labeling prior to, or during, the approval process would directly conflict with the regulations, and is clearly preempted. However, as persuasively stated by the Fourth Circuit Court of Appeals:

> [w]e do not accept the assertion that a generic manufacturer is not responsible for negligent misrepresentations on its product labels if it did not initially formulate the warnings and representations itself. When a generic manufacturer adopts a name brand manufacturer's warnings and representations without independent investigation, it does so at the risk that such warnings and representations may be flawed. In cases involving products alleged to be defective due to inadequate warnings, 'the manufacturer is held to the knowledge and skill of an expert . . . . The manufacturer's status as expert means that at a minimum he must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.' The same principle applies in the instant case; as an expert, a manufacturer of generic products is responsible for the accuracy of labels placed on its products. Although generic manufacturers must include the same labeling information as the equivalent name brand drug, they are also permitted to add or strengthen warnings and delete misleading statements on labels, even without prior FDA approval. The statutory scheme governing premarketing approval for drugs simply does not evidence Congressional intent to insulate generic drug manufacturers from liability for misrepresentations made regarding their products, or to otherwise alter state products liability law. Manufacturers of generic drugs, like all other manufacturers, are responsible for the representations they make regarding their products.

Foster, 29 F.3d at 169-70 (citations omitted).[3]

---

[3] The Court notes that Washington State law, like the Maryland State law to which the Fourth Circuit cited, holds a manufacturer to the standard of an expert. *See, e.g.*, *Koker v. Armstrong Cork, Inc.*, 60 Wn. App. 466, 479 (1991) (holding that "the law establishes a duty by a manufacturer to use ordinary care to keep abreast of scientific knowledge, advances, and research in its product field."); *Spellmeyer v. Weyerhaeuser Corp.*, 14 Wn. App. 642, 649 (1975) (explaining that a manufacturer is held to the "'degree of knowledge and skill of experts'" (citation omitted)).

ORDER
PAGE - 9

1  For all of these reasons, the Court finds that there is no conflict between the state law at issue
2  in this case and the federal regulations or statutes asserted by defendants. Accordingly, summary
3  judgment will be denied on that basis.

### 2. Frustration of Congressional Purpose

Likewise, the Court is not persuaded that allowing plaintiff's claims to move forward would be a frustration of Congressional purpose. Providing new or additional warnings can hardly be an obstacle to the accomplishment of the full objectives of Congress when federal regulations specifically allow manufacturers to do so, and when Congress has left product liability matters to state law, as long as they do not directly conflict with federal law in that area.

### 3. False and Misleading Statements/Misbranding of Products

Finally, to the extent that defendants attempt to argue that the FDA would have considered an additional warning "false and misleading," and thereby would have sued them for misbranding their products, the Court finds that argument unpersuasive.

> Given the hearings by both Congress and the FDA regarding suicidality, the FDA's PDAC's recent decision to recommend black box warnings regarding suicidality in children and adolescents, and the numerous experts who have concluded that there is a link between SSRIs, like Zoloft, and suicidality, it would be inconceivable to this Court to argue that an additional warning regarding suicidality would be false or misleading.

*Cartwright v. Pfizer, Inc.*, 369 F. Supp. 2d 876, 885-886 (E.D. Tex. 2005). Furthermore, there is no suggestion in this case that the FDA would have filed such a suit, and there can be no direct conflict unless the FDA had filed such a suit and prevailed. Therefore, the Court agrees with plaintiff that this argument is of no import.

### III. CONCLUSION

Having reviewed defendants' motion for summary judgment based on the preemption doctrine, plaintiff's response, defendants' reply, the numerous exhibits and declarations in support of those briefs, and the remainder of the record, the Court hereby finds and ORDERS:

ORDER
PAGE - 10

(1)  Defendants' Motion for Summary Judgment (Dkt. #113) is DENIED.

(2)  Defendants' pending Motion for Summary Judgment (Dkt. #117), Motion to Dismiss (Dkt. #151), and Motion to Exclude Testimony of Witnesses Not Disclosed During Discovery (Dkt. #154) will be addressed in separate Orders.

(3)  The Clerk shall forward a copy of this Order to all counsel of record.

DATED this 29th day of March, 2006.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 11