1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  YVONNE A'RAE LAISURE-RADKE,      )
   *et al.*,                         )        CASE NO.  C03-3654RSM
                                     )
10            Plaintiffs,            )
                                     )
11                                   )        ORDER DENYING MOTION FOR
       v.                            )        SUMMARY JUDGMENT
12                                   )
   PAR PHARMACEUTICAL, INC., *et al.*,)
13                                   )
              Defendants.            )
14  _____)

15                          **I.  INTRODUCTION**

16        This matter comes before the Court on defendants' Motion for Summary Judgment pertaining

17  to plaintiff's product liability claims.  (Dkt. #117).  Defendants argue that, to the extent that plaintiff's

18  failure to warn claims are based on common law theories of negligence, those claims are preempted by

19  the Washington Product Liability Act ("WLAP").  Defendants further argue that plaintiff cannot

20  establish proximate cause between the alleged failure to warn and her husband's death, and therefore,

21  her claims should be dismissed as a matter of law.  Finally, defendants argue that Washington law

22  prohibits punitive damages in product liability cases.

23        Plaintiff opposes the motion, asserting that there are questions of fact as to whether defendants

24  should have altered their label, or taken other steps to convey meaningful warnings about the increased

25

26  ORDER
    PAGE - 1

1  association of antidepressants such as fluoxetine and suicidality. (Dkt. #129). Therefore, plaintiff

2  asserts that summary judgment is not appropriate.

3      For the reasons set forth below, the Court agrees with plaintiff and DENIES defendants'

4  motion for summary judgment.

5                                    **II.  DISCUSSION**

6      **A.  Background**

7      Plaintiff, Yvonne A'Rae Laisure-Radke, brings this lawsuit on behalf of herself and as

8  individual representative of her late husband's estate. She alleges that her husband, Douglas Radke,

9  committed suicide while under the influence of the antidepressant drug fluoxetine, which is the generic

10 version of Eli Lilly's Prozac. Defendants manufacture, distribute and market the generic drug in

11 question in this case. Plaintiff essentially asserts that defendants were aware of an increased risk of

12 suicidality in users of the class of antidepressant drugs within which Fluoxetine lies, known as selective

13 serotonin reuptake inhibitors ("SSRIs"), well before the death of Ms. Laisure-Radke's husband, but

14 did not adequately warn of that risk.

15     Douglas Radke was a correctional officer in Whatcom County, Washington. Throughout his

16 life he struggled with alcoholism and depression, although he had been sober for the last 17 months of

17 his life. At the time of his death, Mr. Radke was married to plaintiff, and supported two children from

18 his previous marriage to Eva Browning.

19     In March of 2000, Mr. Radke began individual counseling sessions for marital problems and

20 other stresses in his life with Priscilla Tragessor Hone, Ph.D., a chemical dependency specialist. He

21 stopped drinking in June of 2000. Although he apparently experienced intense cravings, he remained

22 sober, with the exception of one beer on New Year's Eve, until he died.

23     On October 26, 2000, Mr. Radke began counseling sessions with Michael Praetzel, a clinical

24 social worker. After seeing Mr. Radke again on October 31, 2000, Mr. Praetzel diagnosed him with

25

26 ORDER
   PAGE - 2

1  general anxiety disorder, depression and high levels of stress.

2      On January 31, 2001, Mr. Radke was assessed for his alcoholism by Dr. Portman, a

3  psychologist.  Dr. Portman referred Mr. Radke to an intensive outpatient program for his alcoholism.

4  During that time, it appears that Mr. Radke was also taking Atenolol and Wellbutrin for his anxiety

5  and depression.

6      On January 23, 2001, during a doctor's appointment with Dr. Moore, who had been Mr.

7  Radke's physician since 1991, Mr. Radke reported that he believed he was experiencing sweat

8  outbreaks and shakes as side effects of the medication he was taking.  Dr. Moore discontinued Mr.

9  Radke's prescriptions for Atenolol and Wellbutrin, and prescribed Prozac.  He also advised Mr. Radke

10  to seek assistance from a psychiatrist, recommending two choices.  Mr. Radke apparently never saw

11  either one.

12      On February 8, 2001, Mr. Radke saw Dr. Moore for a follow-up visit for his depression.  Dr.

13  Moore continued his prescription for Prozac.

14      On March 22, 2001, Mr. Radke saw Mr. Praetzel, and apparently told him that he felt more

15  balanced on Prozac.  However, he also reported that he had been having homicidal tendencies.  As a

16  result, Mr. Praetzel also recommended that Mr. Radke see one of the two psychiatrists Dr. Moore had

17  recommended, but again Mr. Radke failed to do so.

18      On April 16, 2001, Dr. Moore increased Mr. Radke's Prozac prescription from 20 mg once a

19  day to 40 mg once a day.  That was Mr. Radke's last visit to Dr. Moore.

20      On August 2, 2001, the Food and Drug Administration ("FDA") approved defendants' generic

21  fluoxetine 40 mg capsules.  The approved label included information relating to suicide.  Under the

22  "Precautions" section, it read:

23      Suicide – The possibility of a suicide attempt is inherent in depression and may
       persist until significant remission occurs.  Close supervision of high risk patients
24      should accompany initial drug therapy.  Prescriptions for fluoxetine should be
       written for the smallest quantity consistent with good patient management in order

25

26  ORDER
    PAGE - 3

1    to reduce the risk of overdose.

2  In addition, "suicide attempt" was listed as an adverse event reported during clinical trials.

3    On August 30, 2001, Mr. Radke refilled his Prozac prescription and received defendants'

4  generic fluoxetine 40 mg capsules. Shortly thereafter, he began voicing thoughts of suicide. Plaintiff,

5  Mr. Praetzel, Dr. Moore, Mr. Radke's children and other members of Mr. Radke's family all testify

6  that he had never voiced any notions of suicide or suicidal ideation prior to that time period.

7    On October 8, 2001, Mr. Radke saw a counselor at Chambers and Wells. That counselor

8  apparently recommended that Mr. Radke see a psychiatrist. Again, Mr. Radke chose not to do so.

9    On October 11, 2001, Mr. Radke refilled his Prozac prescription and received generic

10  fluoxetine.

11    On November 15, 2001, Mr. Radke filled his Prozac prescription and received generic

12  fluoxetine.

13    On November 18, 2001, Mr. Radke packed some clothes and left the state. Three days later,

14  he apparently called his brother and told him that he was headed east, with no particular destination in

15  mind, and that he intended to get a job and send money home for child support.

16    On November 27, 2001, a rancher in Kansas found Mr. Radke's car at the entrance to his

17  pasture. Tragically, sometime earlier, Mr. Radke had climbed into the trunk and shot himself in the

18  head. He left notes for "the person that found him," his wife, his children, his parents, and one of his

19  former colleagues, explaining that he had struggled with mental illness, he was hearing voices that

20  seemed to control him, and he had given all he could but it just wasn't enough. The instant lawsuit

21  followed.

22    In her Complaint, plaintiff makes three claims for relief, including:

23    FIRST: All defendants are jointly and severally liable for marketing a defective
     product with inadequate and/or legally defective labeling and for marketing with
24    misrepresentations . . . .

25
   ORDER
26  PAGE - 4

1

2

3

> SECOND: Defendants' conduct is unreasonable, or negligent, and was a proximate cause of Plaintiff's decedent's injuries and death. The manufacturers were all negligent for failing to warn, failing to test or otherwise to investigate the association between FLUOXETINE, akathisia, psychosis, and suicide, and for misrepresenting and over-promoting "FLUOXETINE."

4

5

6

> THIRD: Defendants' [sic] are liable because "FLUOXETINE" was defective and potentially harmful to its consumers/users, including Plaintiff [sic] decedent, and because adequate warnings were not provided with the product or after manufacture, and as such was unsafe to an extent beyond that contemplated by an ordinary user and consumer set forth in RCW 7.72.030.

7    (Dkt. #39 at 11).

8    **B. Common Law Negligence Claims**

9    As a threshold matter, the Court addresses defendants' argument that product-related,

10   common law liability claims filed after July 26, 1981, are preempted by the WPLA. Defendants assert

11   that plaintiff's claims for negligent failure to warn, negligent failure to test or otherwise investigate the

12   association between fluoxetine, akathasia, psychosis, and suicide, negligent misrepresentation and

13   negligent over promotion, which all appear to be based on common law negligence theories, must be

14   dismissed as a matter of law. Defendants further assert that plaintiff's claim for negligent marketing of

15   a defective product with inadequate and/or legally defective labeling, which also appears to be based

16   on a common law theory of negligence, should also be dismissed as a matter of law. The Court

17   agrees.

18   As the Supreme Court of Washington explained in *Washington Water Power Co. v. Graybar*

19   *Elec. Co.*, 112 Wn. 2d 847, 850-55(1989), the WPLA preempts traditional common law remedies for

20   product-related harms. Such "[a] claim previously based on negligence is within the definition of a

21   product liability claim. Since this present cause of action is predicated upon a failure to warn by a

22   product manufacturer, any negligence cause of action therefor is now preempted by the [W]PLA.

23   Therefore, this product liability claim cannot be maintained on a common law negligence theory."

24   *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 323 (1993).

25

26   ORDER
     PAGE - 5

1    Accordingly, the Court DISMISSES plaintiff's claims for negligent failure to warn, negligent

2  failure to test or otherwise investigate the association between fluoxetine, akathasia, psychosis, and

3  suicide, negligent misrepresentation, negligent over promotion and negligent marketing of a defective

4  product with inadequate and/or legally defective labeling, to the extent that they are based on a

5  common law theory of negligence.

6          **C. Washington State Product Liability Claims**

7          The Court now turns to defendants' arguments pertaining to claims arising under the WPLA.

8              *1. Defendant's Compliance with Labeling Regulations*

9          Defendants first argue that plaintiff's failure to warn claim should be dismissed because

10  defendants were forbidden to alter their label from that of the reference listed drug, Prozac.  The

11  Court has already addressed this argument in its Order on defendants' motion for summary judgment

12  based on the preemption doctrine.  (Dkt. #165).  In that motion, relying on 21 U.S.C.

13  § 355(j)(2)(A)(v) and 21 C.F.R. § 314.94(a)(8), defendants argued that a "generic manufacturer

14  simply cannot deviate its labeling from that of a reference listed drug." (Dkt. #113 at 23).  The Court

15  agreed that as part of its abbreviated new drug application ("ANDA"), a generic manufacturer must

16  submit information that its proposed label is identical to that of the reference listed drug.  (Dkt. #165

17  at 5).  However, the Court found defendants' argument flawed with respect to manufacturers that hold

18  approved ANDAs, determining that once the ANDA is approved, generic manufacturers have the

19  same power and duty to add or strengthen their warnings, as do the manufacturers of pioneer drugs,

20  and therefore, the same liability.  (Dkt. #165 at 6-7).  The Court further found that once a generic drug

21  manufacturer holds an approved ANDA for a particular product, it can add or strengthen a

22  contraindication, warning, precaution or adverse reaction at any time without prior FDA approval.

23  (Dkt. #165 at 8).  Thus, the Court again denies defendants' motion for summary judgment on that

24  basis.

25

26  ORDER
    PAGE - 6

1

      *2.  RCW 7.72.030(2)*

2

      Before addressing plaintiff's product liability claims under RCW 7.72.030(1), the Court

3

addresses plaintiff's apparent argument that a strict liability standard should apply to this case because

4

RCW 7.72.030(2) mandates such a standard.  RCW 7.72.030 (2) provides:

5

      (2) A product manufacturer is subject to strict liability to a claimant if the claimant's harm was proximately caused by the fact that the product was not reasonably safe

6

      in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or to the implied warranties under Title 62A RCW.

7

8

      (a) A product is not reasonably safe in construction if, when the product left the control of the manufacturer, the product deviated in some material way from the design specifications or performance standards

9

      of the manufacturer, or deviated in some material way from otherwise identical units of the same product line.

10

11

      (b) A product does not conform to the express warranty of the manufacturer if it is made part of the basis of the bargain and relates to a material fact or facts concerning the product and the express warranty

12

      proved to be untrue.

13

      (c) Whether or not a product conforms to an implied warranty created under Title 62A RCW shall be determined under that title.

14

RCW 7.72.030(2)(a)-(c).  It is not clear to this Court how that section applies to the instant case.

15

      Nothing in plaintiff's First Amended Complaint indicates that plaintiff alleges a breach of any

16

warranty, express or implied.  (*See* Dkt. #39).  Indeed, in her Response to the instant motion, plaintiff

17

fails to identify any alleged breach of warranty either express or implied.  The Court recognizes that

18

under Title 62A, implied warranties include the implied warranty of merchantability, and that the

19

warranty of merchantability encompasses considerations of the adequacy of the package and label.

20

RCW 62A.2.314(2); *Hue v. Farmboy Spray Co.*, 127 Wn. 2d 67, 89-90 (1995).  However, if plaintiff

21

believes she has raised a breach of implied warranty claim, she has completely failed to indicate which

22

implied warranty was not honored by defendants, nor has she alleged any facts in support of such a

23

claim, and this Court will not presume to raise a claim that plaintiff failed to allege.  *See Hue*, 127 Wn.

24

2d at 90 (explaining that the court cannot make such a presumption).  Accordingly, the Court rejects

25

ORDER

26

PAGE - 7

1  plaintiff's arguments based on RCW 7.72.030(2).

2                   *3. Inadequate Labeling/Failure to Warn Claims*

3        Defendants next argue that, with respect to plantiff's WPLA failure to warn claim, plaintiff has

4  failed to demonstrate proximate cause, as she has failed to establish any causal link between the

5  alleged failure to warn and her alleged injuries.  Plaintiff responds that a question of material fact exists

6  as to whether the warnings defendants provided were adequate, and whether defendants acted

7  reasonably in light of the information known about increased risk of suicidality and SSRIs at the time

8  of manufacture.

9        RCW 7.72.030 states in pertinent part:

10        A product manufacturer is subject to liability to a claimant if the claimant's harm
    was proximately caused by the negligence of the manufacturer in that the product

11        was not reasonably safe as designed or not reasonably safe because adequate
    warnings or instructions were not provided.

12        . . .

13        (b)  A product is not reasonably safe because adequate warnings or instructions
    were not provided with the product, if, at the time of manufacture, the likelihood

14        that the product would cause the claimant's harm or similar harms, and the
    seriousness of those harms, rendered the warnings or instructions of the

15        manufacturer inadequate and the manufacturer could have provided the warnings or
    instructions which the claimant alleges would have been adequate.

16

17        (c) A product is not reasonably safe because adequate warnings or instructions were
    not provided after the product was manufactured where a manufacturer learned or
    where a reasonably prudent manufacturer should have learned about a danger

18        connected with the product after it was manufactured. In such a case, the
    manufacturer is under a duty to act with regard to issuing warnings or instructions

19        concerning the danger in the manner that a reasonably prudent manufacturer would
    act in the same or similar circumstances. This duty is satisfied if the manufacturer

20        exercises reasonable care to inform product users.

21  RCW 7.72.030(1)(b).  It appears from the Third Claim for Relief set forth in plaintiff's First Amended

22  Complaint that both subparagraph (b) and (c) are alleged bases for her claims.  (Dkt. #39 at 11)

23  (alleging that adequate warnings were not provided with the product or after manufacture).

24        Until recently, it appeared that Washington courts applied a strict liability standard to all failure

25

26  ORDER
    PAGE - 8

to warn and inadequate warning claims brought under RCW 7.72.030(1)(b).  *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 763 (1991); *Anderson v. Weslo, Inc., et al.*, 70 Wn. App. 829, 838 (1995).[1]  The Ninth Circuit Court of Appeals had also determined that such claims would likely be examined under a strict liability standard.  *Transue v. Aesthetech Corp., et al.*, 341 F.3d 911, 918-19 (9th Cir. 2003).  However, in *Estate of LaMontagne v. Bristol Meyers Squibb, et al.*, 127 Wn. App. 335 (2005), the Washington State Court of Appeals firmly stated that "[w]hether a prescription drug manufacturer provides adequate warning to physicians is governed by the negligence standard under the *Restatement (Second) of Torts § 402A, cmt. k* (1965)," thereby distinguishing prescription drug products from the consumer products examined in *Ayers* and *Andserson*, *supra*.  *LaMontagne*, 127 Wn. App. at 343 (explaining that comment k, adopted by the Washington Supreme Court in *Terhune v. A. H. Robins, Co.,* 90 Wn.2d 9, 12-13 (1978), is an exception to strict liability for unavoidably unsafe products); *see also Ruiz-Guzman v. Amvac Chem. Corp.*, 141 Wn.2d 493 (2000); *Young v. Key Pharmaceuticals*, 130 Wn. 2d 160, 166-67 (1996).  In *Terhune*, the court also made clear that where the product can be sold only under prescription, the duty to warn runs only to the physician, not to the ultimate consumer.  *Terhune*, 90 Wn.2d at 13, 17.  Thus, the Court first addresses whether defendants' label provided warnings that were adequate as a matter of law.

Like RCW 7.72.030(1), comment k imposes a duty on a drug manufacturer to warn of the known dangers and risks associated with prescription drugs.  It states:

> *Unavoidably unsafe products.*  There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs.  An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected.  Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve.  Such a product, properly prepared, and accompanied by proper

---

[1]  The state Supreme Court has distinguished subparagraph (b) from subparagraph (c), "which clearly embraces a negligence standard."  *Ayers*, 117 Wn.2d at 765.

ORDER
PAGE - 9

1
2
3
4
5
6
7

> directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

8  Restatement (Second) of Torts § 402A, cmt. k (1965). The comment further provides that a warning

9  for a prescription drug may be adequate as a matter of law if it provides specific and detailed

10 information about the risks of using the drug. *Id.*

11      To determine whether a warning is adequate requires an analysis of the warnings as a whole

12 and the language used in the package insert. *LaMontagne*, 127 Wn. App. at 344. The court must

13 examine the meaning and context of the language and the manner of expression to determine if the

14 warning is accurate, clear and consistent and whether the warning portrays the risks involved in taking

15 the prescription drug. *Martin v. Hacker*, 83 N.Y.2d 1, 10-11, 628 N.E.2d 1308, 607 N.Y.S.2d 598

16 (1993); *cf. Little v. PPG Indus., Inc.*, 92 Wn.2d 118 (1979) (determining the adequacy of a warning

17 by examining whether the warning sufficiently attracted the attention of the product users and

18 informed them of the dangers of the product).

19      In addition, in addressing whether a drug manufacturer has met its duty to give adequate

20 warnings for prescription drugs, Washington has adopted the "learned intermediary" doctrine.

21 *LaMontagne*, 127 Wn. App. at 345; *Terhune*, 90 Wn.2d at 13-14. Under the learned intermediary

22 doctrine a drug manufacturer satisfies its duty "to warn of dangers involved in use of a product . . . if it

23 gives adequate warning to the physician who prescribes it." *Id.* at 13. The *Terhune* Court explained

24 that when a product that is available only through prescription

25

26 ORDER
   PAGE - 10

1

2

3

> is properly labeled and carries the necessary instructions and warnings to fully
> apprise the physician of the proper procedures for use and the dangers involved, the
> manufacturer may reasonably assume that the physician will exercise informed
> judgment thereby gained in conjunction with his own independent learning, in the
> best interest of the patient.

4

*Terhune*, 90 Wn.2d at 14.

5

Finally, because FDA regulations provide only the minimum requirements for drug

6

manufacturers, compliance with those regulations does not necessarily establish that the warnings at

7

issue were adequate.  *See Wash. State Physicians Ins. Exchange & Assoc. v. Fisons Corp.*, 122 Wn.2d

8

299, 328-29 (1993).

9

In the instant case, defendants provided the following suicide-related warnings on their label.

10

Under the "Precautions" section, it read:

11

12

13

> Suicide – The possibility of a suicide attempt is inherent in depression and may
> persist until significant remission occurs.  Close supervision of high risk patients
> should accompany initial drug therapy.  Prescriptions for fluoxetine should be
> written for the smallest quantity consistent with good patient management in order
> to reduce the risk of overdose.

14

In addition, "suicide attempt" was listed as an adverse event reported during clinical trials.  Plaintiff

15

argues that in light of the information available at the time of manufacture, and after manufacture,

16

there should have been a stronger warning, such as the Black Box warning now required on all SSRIs,

17

which indicates an increased risk for suicidal behavior in children and adolescents who are being

18

treated with those drugs.

19

Defendants first argue that plaintiff's claim fails because she has not articulated what warning

20

she believes would have been adequate.  The Court finds this argument without basis.  In *Ayers*,

21

*supra*, the Supreme Court of Washington rejected a nearly identical argument, holding "that the

22

language of RCW 7.72.030(1)(b) does not require a claimant to establish the exact wording of the

23

alternative warning.  The statute's requirement . . . is satisfied if the claimant specifies the substance of

24

the warning."  *Ayers*, 117 Wn.2d at 756.  Plaintiff has done so in the instant case.

25

26

ORDER
PAGE - 11

1    Defendants next argue plaintiff has failed to specify any new information that defendants

2    learned or should have learned after manufacture, and that even if there was such information,

3    defendants could not have provided a stronger warning based on such information within the four

4    month window it had between the date it was approved for marketing and the date that Mr. Radke

5    committed suicide.  Defendants assert that for these reasons, plaintiff's claims fail as a matter of law.

6    The Court disagrees.

7    First, the Court has already rejected defendants' inability to warn without prior FDA approval

8    argument above, and, in more detail, in its previous Order denying defendants' motion for summary

9    judgment based on the preemption doctrine.  Second, plaintiff has provided expert testimony

10   supported by numerous medical journal articles, case studies, and other documents, raising a genuine

11   issue of material fact as to whether defendants were aware or should have been aware of an increased

12   risk of suicidality in patients using SSRIs.  Indeed, defendants themselves note that starting in 1991,

13   after Prozac was approved for market, the FDA began receiving requests for warnings of such a risk,

14   which eventually led to further investigation by the FDA and SSRI manufacturers.  Moreover, Dr.

15   Moore testified that he was aware of such increased risk as early as the late 80s or early 90s, and

16   warned his patients of that risk at the time.  For these reasons, the Court finds that defendants' label

17   cannot be deemed adequate as a matter of law, and that the adequacy question is more appropriately

18   resolved by the jury.

19   The Court next addresses the issue of proximate cause, which can be resolved as a matter of

20   law when no reasonable persons would differ.  *Lunt v. Mt. Spokane Skiing Corp.*, 62 Wn. App. 353,

21   362, *review denied*, 118 Wn.2d 1007 (1991).  To show proximate causation, the plaintiff must show

22   both cause in fact and legal causation.  *Ayers*, 117 Wn.2d at 753; *Baughn v. Honda Motor Co.*, 107

23   Wn.2d 127, 142 (1986).  "Cause in fact refers to the 'but for' consequences of an act – the physical

24   connection between an act and an injury."  *Hartley v. State*, 103 Wn.2d 768, 778 (1985).  Legal

25

26   ORDER
     PAGE - 12

1  causation depends on considerations of "logic, common sense, justice, policy, and precedent." *King v.*

2  *Seattle*, 84 Wn.2d 239, 250 (1974).  It involves the "determination of whether liability *should* attach as

3  a matter of law given the existence of cause in fact." *Hartley*, 103 Wn.2d at 779 (emphasis in

4  original).

5        Cause in fact is usually a jury question. *Baughn*, 107 Wn.2d at 142.  However, it may

6  become a question of law "when the facts are undisputed and inferences therefrom are plain and

7  incapable of reasonable doubt or differences of opinion. . . ." *Id.*  Defendants argue that plaintiff fails

8  to appreciate the importance of the learned intermediary doctrine.  Defendants believe that because Dr.

9  Moore was aware of the data pertaining to the increased risk of suicidality and SSRIs both now and at

10  the time he was prescribing Prozac to Mr. Radke, but would still prescribe Prozac to Mr. Radke if he

11  were alive today, plaintiff cannot meet her burden of proof as a matter of law.  Again, the Court

12  disagrees.  Dr. Moore's deposition does not indicate that he would continue prescribing Prozac for

13  Mr. Radke had there been adequate warnings pertaining to an increase in suicidality associated with

14  that drug.  Instead, Dr. Moore simply states that once the FDA determined that the data was

15  insufficient to prove such a link, he determined that he was "probably not increasing the risk of suicide

16  in [his] depressed patients by using Prozac, but that hopefully, if [he was] doing the right things, [he

17  was] diminishing that risk."  (Dkt. #115, Ex. U at 112).  Given the conditional language of that

18  statement, there appears to be a genuine issue regarding whether a different, increased warning would

19  have persuaded Dr. Moore to take a different course of action with Mr. Radke.  Accordingly, the

20  Court finds that the issue of cause in fact must be left to the jury.

21        Finally, the Court turns to the question of legal causation.  In conclusory fashion, defendants

22  argue that logic, common sense, justice, policy and precedent all weigh in favor of awarding

23  defendants summary judgment.  However, this Court believes that Washington case law, particlularly

24  those cases cited above, supports imposing a duty of manufacturers of generic prescription drugs, just

25

26  ORDER
   PAGE - 13

1    as it would impose liability on a manufacturer of a reference listed drug if a factfinder determined that

2    it had failed to adequately warn physicians of a particular risk of harm to their patients.  Thus, this

3    Court finds that should a jury find causation in fact, liability should attach to defendants.

4            **D.  Punitive Damages**

5            Finally, defendant argues that plaintiff's punitive damages request should be dismissed because

6    Washington law prohibits punitive damages in a product liability action.  Plaintiff has failed to respond

7    to this argument.  Accordingly, the Court deems it unopposed, and will dismiss plaintiff's request for

8    punitive damages.

9                              **III.  CONCLUSION**

10           Having reviewed defendants' motion for summary judgment, plaintiff's response, defendants'

11   reply, the numerous exhibits and declarations in support of those briefs, and the remainder of the

12   record, the Court hereby finds and ORDERS:

13           (1)  Defendants' Motion for Summary Judgment (Dkt. #117) is DENIED.

14           (2)  Any request for punitive damages by plaintiff will be DENIED.

15           (3)  Defendants' pending Motion to Dismiss (Dkt. #151) and Motion to Exclude Testimony of

16   Witnesses Not Disclosed During Discovery (Dkt. #154) will be addressed in separate Orders.

17           (4)  The Clerk shall forward a copy of this Order to all counsel of record.

18           DATED this 31st day of March, 2006.

19

20

21                                      RICARDO S. MARTINEZ
                                        UNITED STATES DISTRICT JUDGE
22

23

24

25
     ORDER
26   PAGE - 14